**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO EASTERN DIVISION**

LAURA DELANCY
Administrator of the Estate
of Brodie Malakai DeLancy
13333 SR 550
Fleming, Ohio 45729

Plaintiff,

v.

UNITED STATES OF AMERICA
c/o United States Attorney's Office
Southern District of Ohio
303 Marconi Blvd., Suite 200
Columbus, Ohio 43215

and

JOHN DOES 1-10
Names and Addresses Unknown;

and

JANE DOES 1-10
Names and Addresses Unknown;

Defendants.

Case No. ______________________

Judge:_________________________

**JURY DEMAND ENDORSED HEREON**

**COMPLAINT**

Now comes Plaintiff Laura DeLancy, Administrator of the Estate of Brodie Malakai DeLancy, (hereinafter "Plaintiff") and for her Complaint against Defendants United States of America, John Does 1-10, and Jane Does 1-10 and hereby states as follows:

**PRELIMINARY STATEMENT**

1. This action arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671–2680, and concerns claims for damages resulting from the negligent medical care and treatment of Brodie Delancy, which resulted in Mr. DeLancy's death.

2. On June 27, 2025, this case was originally filed in the Washington County (Ohio) Court of Common Pleas, case no. 25PT190, against Hopewell Health Centers, Inc. ("Hopewell Health") and Patrick G. Swanson, M.D. ("Swanson"), as well as Memorial Health System, Marietta Memorial Belpre Campus, Akron Children's Hospital, Monica Rondinelli, M.D., Maria Victorio, M.D., Jubel Puthusseril, D.O., Kelly Nixon, D.O., Francesa M. Cumo, D.O., Michael Kohrman, M.D., and Janelle A. Thomas, M.D (the "Washington County Case").

3. On January 29, 2026, the United States of America ("United States") simultaneously filed a Notice of Removal to remove the Washington County Case to this Court, and a Notice of Substitution of the United States as Defendant for Hopewell Health and Swanson. Accordingly, the United States Attorney for the Southern District of Ohio certified that Defendants Hopewell Health and Swanson were deemed to be employees of the Public Health Service for purposes of 42 U.S.C § 233(a) (the "1st Federal Case"). *See DeLancy v. Marietta Health System*, S.D. Ohio 2:26-cv-00101, ECF Nos. 1 and 2.

4. Plaintiff subsequently filed a motion to voluntarily dismiss the United States without prejudice so that the administrative process could be completed with the Department of Health and Human Services, and so that the claims against the remaining defendants could be remanded to Washington County. On February 27, 2026, this Court dismissed the United States without prejudice, remanded the remaining claims to Washington County, and dismissed the 1st Federal Case without prejudice. *Id.* ECF Nos. 10, 11.

5. On February 18, 2026, Plaintiff filed a civil action in the Circuit Court of Wood County, West Virginia, case no. CC-54-2026-C-48, against the West Virginia University Medical Corporation d/b/a University Health Associates and the West Virginia Board of Governors in

regard to the same incident as alleged in the Washington County Case and the 1st Federal Case (the "Wood County Case").

6. The Washington County Case and the Wood County Case are still pending.

7. The facts alleged in this action are almost identical to those alleged in the Washington County Case and the Wood County Case. They arise from medical services provided by Swanson and Hopewell Health, among others, to Mr. DeLancy.

**<u>JURISDICTION AND VENUE</u>**

8. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1346(b)(1), which confers exclusive jurisdiction upon the federal district courts over civil actions seeking money damages against the United States for personal injury or death caused by the negligent or wrongful act or omission of a Government employee acting within the scope of employment, under circumstances in which the United States, if a private person, would be liable under the law of the place where the act or omission occurred.

9. The claims asserted herein arise from medical services provided by Swanson and Hopewell Health to Mr. DeLancy. The United States Department of Health and Human Services ("HHS") has previously determined that Hopewell Health and Swanson are deemed employees of the Public Health Service pursuant to 42 U.S.C. § 233(g), with respect to the services at issue in this action. *See DeLancy v. Marietta Health System*, S.D. Ohio 2:26-cv-00101, ECF Nos. 1 and 2.

10. Pursuant to 42 U.S.C. § 233(g), the remedy against the United States under the FTCA is the exclusive remedy for covered claims arising from the acts or omissions of the deemed Public Health Service employees. Accordingly, the United States is the proper Defendant in this action in place of Swanson and Hopewell Health, which have previously been substituted as parties

by the United States. *See DeLancy v. Marietta Health System*, S.D. Ohio 2:26-cv-00101, ECF No. 2.

11. Plaintiff has satisfied the applicable administrative requirements of 28 U.S.C. § 2675(a) by presenting a claim for damages to HHS on December 8, 2025, which claim was denied in writing on May 7, 2026.[1]

12. Venue is proper in the United States District Court for the Southern District of Ohio pursuant to 28 U.S.C. § 1402(b) because the acts or omissions giving rise to the claim occurred within this District and the relevant plaintiff resides within this District, as applicable to the facts of this case.

## PARTIES

13. Laura DeLancy ("Laura") is the duly appointed Administrator of the Estate of Brodie Malakai DeLancy and brings this action on behalf of all statutory beneficiaries of Brodie DeLancy. A true and accurate copy of the Washington County Probate Court Entry appointing Mrs. DeLancy as the Administrator of the decedent's estate is attached as Exhibit 1.

14. Defendant United States has been named in place of Patrick G. Swanson, M.D. and Hopewell Health Centers, Inc. The United States Attorney for the Southern District of Ohio previously certified that Hopewell Health and Swanson were "deemed to be an employee of the Public Health Service under 42 U.S.C. § 233 at the time of the alleged incident out of which Plaintiff Laura Delancy's suit arose," and that they were "acting within the scope of employment." *See DeLancy v. Marietta Health System*, S.D. Ohio 2:26-cv-00101, ECF No. 1-2.

[1] Counsel for Plaintiff received a second letter, dated September 22, 2026, from HHS, which appears duplicative and similarly denies Plaintiff's 12/08/2025 HHS administrative claim.

15. Defendants John and Jane Does 1-10 were residents of the state of Ohio, West Virginia, and/or Kentucky and are physicians, nurses, employees, agents, or other personnel of Defendant Hopewell Health, whose names and addresses are unknown to Plaintiff and could not be reasonably ascertained and/or discovered prior to the filing of this Complaint. Defendants John and Jane Does 1-10 provided medical care and treatment to Brodie DeLancy as generally described in this Complaint.

**FACTS COMMON TO ALL CLAIMS**

16. Plaintiff's decedent, Brodie DeLancy ("Brodie" or "decedent"), was at all times relevant to this Complaint, a 17-year-old male who was a junior at Warren Local High School in Washington County, Ohio. Brodie had a history of attention deficit hyperactivity disorder (ADHD), but was otherwise a healthy young man with an unremarkable medical history.

17. At approximately 7:30 a.m. on January 9, 2024, Brodie's parents, Laura and Benjamin, found him unresponsive in his bedroom. After about ten minutes, they were able to rouse Brodie, and once he regained alertness, he sat up, vomited, and then shortly thereafter had a nosebleed.

18. Laura and Benjamin immediately took Brodie to the emergency room at Belpre Campus where he was evaluated by Janelle A. Thomas, M.D. Brodie reported that he felt back to baseline and had no recollection of the unresponsive episode. Dr. Thomas noted that Brodie had a petechial rash around both of his eyes and on his anterior neck and upper chest. It was also noted that Brodie sustained a bite wound to his tongue, which he indicated was not there when he went to bed the previous evening.

19. In order to investigate further, blood work and a head CT was ordered. The results of the blood work demonstrated that Brodie had a slightly elevated white blood cell count at 14.8,

and the head CT revealed a small lesion in the left frontal lobe of Brodie's brain. To obtain further characterization of the lesion, a follow-up MRI of the brain with and without contrast was recommended.

20. Dr. Thomas indicated that, clinically, Brodie "probably seized." However, there was no further work up done on the elevated white blood cell count, the seizure activity, or the discovered brain lesion. Instead, Brodie was administered 1000 mg of Keppra, an anticonvulsant, and he was transferred by ambulance to Akron Children's Hospital.

21. At approximately 8:30 p.m. on January 9, 2024, Brodie was admitted to Akron Childrens under the care of Maria Victorio, M.D. A physical examination was subsequently performed on Brodie by pediatric residents, Jubel Puthusseril, D.O. and Kelly Nixon, D.O.

22. Following the examination, Dr. Puthusseril ordered an electroencephalogram monitor (aka an EEG) to monitor the electrical activity in Brodie's brain. The EEG lasted for approximately six hours, from 1:38 a.m. until 7:49 a.m. on January 10 and was performed by Michael Kohrman, M.D. No abnormalities were observed by Dr. Kohrman, and the results were determined to be normal. After the EEG, Monica Rondinelli, M.D. and pediatric resident Francesa M. Cumo, D.O., consulted with Brodie. They performed another physical examination and reviewed Brodie's chart.

23. Shortly thereafter, an MRI was performed to further characterize the brain lesion seen on Brodie's previous CT scan. Upon review of that MRI, Brodie's medical team concluded that Brodie had considerable paranasal sinus mucosal disease (aka sinusitis) on the left side.

24. Based on the results of the EEG and the MRI, coupled with the fact that Brodie had displayed no neurological abnormalities during his stay, Akron Childrens' neurologist, Dr. Rondinelli, decided that "the event that brought [Brodie] to our hospital" was "unlikely to be a

seizure." She hypothesized that a "[m]igraine headache remains a possible cause" and that Brodie should follow up with his primary care physician. Brodie was discharged from Akron Childrens at approximately 1:30 p.m. on January 10, 2024 by Drs. Rondinelli and Cumo.

25. On January 18, 2024, Brodie, accompanied by both of his parents, presented to Mid-Ohio Valley Medical Group ("Mid-Ohio") at Camden Clark Medical Center (located in Vienna, West Virginia) for his follow-up appointment with Benjamin Ujlaki, M.D. At this appointment Brodie was seen by nurse practitioner Jessica E. Scritchfield Wooten, APRN-BC, DNP, FNP BC ("Wooten"), and he reported no further episodes like the January 9 event.

26. Wooten noted that Akron Childrens had concluded that it was unlikely that Brodie had suffered a seizure and that he had possibly suffered a migraine. Wooten reported that she "suspect[ed] that patient could have micturition syncope," and she reportedly instructed Brodie and his parents to monitor any recurrence of symptoms and to return if symptoms worsen or fail to improve, and if so, she would refer him to neurology for further evaluation. Otherwise, Brodie should follow-up with Dr. Ujlaki for his June 2024 wellness visit.

27. On January 26, 2024 at 8:30 a.m., Brodie had a telehealth visit with Patrick G. Swanson, M.D. at Hopewell Health. Both parents attended this appointment, and it lasted approximately 17 minutes. Brodie reported that he was experiencing "irritability" and was "lashing out." As a result, Dr. Swanson prescribed him escitalopram oxalate, which is an anti-depressant commonly known as Lexapro. There was no further work-up done, nor was there an evaluation to determine the appropriateness of this drug given Brodie's recent medical events.

28. That same day at approximately 2:00 p.m., Brodie, along with his mother Laura, presented to Mid-Ohio and were seen by Wooten. They reported that Brodie was experiencing daily headaches, as well as chronic nosebleeds that were occurring every other day and that they

started the day of the January 9 event. Brodie and/or Laura informed Mid-Ohio of the new escitalopram oxalate prescription that Brodie was prescribed earlier in the day, which clearly demonstrated a neurological change since his last visit.

29. Despite Brodie's new symptoms and neurological changes, as well as her suspicion of micturition syncope, Wooten did not refer Brodie to a neurologist, cardiologist, or any other specialist for further evaluation. Rather, Wooten recommended Brodie take an over-the-counter antihistamine and advised him to use Aquaphor, and indicated that if the nosebleeds continued to persist, she would refer him to an ENT.

30. On February 19, 2024, Laura found Brodie deceased in his bedroom. An autopsy was performed, and the cause of death was specified as "sudden unexpected death in seizure."

**COUNT ONE**

*(Medical Malpractice/Medical Negligence)*

31. Plaintiff incorporates the preceding paragraphs as if fully restated herein.

32. The medical care provided to Brodie by Patrick G. Swanson, M.D. and Hopewell Health Centers, Inc., whose acts and omissions are attributable to Defendant United States for purposes of the FTCA, and John and Jane Does 1-10, fell below the generally accepted standards of medical care, skill, treatment, and diligence for health care providers under the same or similar circumstances and/or constituted medical malpractice/medical negligence because, among other things, they:

a. Failed to properly evaluate, diagnose, and/or treat Brodie prior to prescribing escitalopram oxalate, which is known to induce and/or exacerbate seizure activity and increase the risk for cardiac arrhythmias.

b. Failed to properly evaluate, diagnose, and/or treat Brodie despite the onset of new symptoms including daily headaches, chronic nosebleeds, suspected micturition syncope, as well as a newly prescribed prescription of escitalopram oxalate for neurological changes.

c. Failed to refer Brodie to a specialist for further evaluation and/or treatment despite the onset of new symptoms including daily headaches, chronic nosebleeds, and suspected micturition syncope, and a newly prescribed prescription of escitalopram oxalate for neurological changes.

33. Such actions and/or omissions were intentional, willful, reckless, and/or demonstrate actual malice including a conscious disregard for the rights and safety of Brodie that had a great probability of causing him substantial harm.

34. At all times relevant to the claims raised in this Complaint, Patrick G. Swanson, M.D., whose acts and omissions are attributable to Defendant United States for purposes of the FTCA, John and Jane Does 1-10, were employed by and/or acting within the course and scope of their employment agency on behalf of Hopewell Health Centers, Inc., whose acts and omissions are attributable to Defendant United States for purposes of the FTCA, making these Defendants vicariously liable pursuant to *Respondeat Superior* and/or Agency by Estoppel.

35. As a direct and proximate result of Patrick G. Swanson, M.D., whose acts and omissions are attributable to Defendant United States for purposes of the FTCA, John and Jane Does 1-10's conduct that fell below the generally accepted standards of medical care, skill, treatment, and diligence for health care providers under the same or similar circumstances and/or constituted medical malpractice/medical negligence, Brodie DeLancy sustained serious medical complications, conscious pain and suffering, injury, and mental anguish and grief before his death on February 19, 2024, the value of which exceeds $75,000.

**COUNT TWO**
*(Wrongful Death)*

36. Plaintiff incorporates the preceding paragraphs as if fully restated herein.

37. The medical care provided to Brodie by Patrick G. Swanson, M.D. and Hopewell Health Centers, Inc., whose acts and omissions are attributable to Defendant United States for purposes of the FTCA, and John and Jane Does 1-10, fell below the generally accepted standards of medical care, skill, treatment, and diligence for health care providers under the same or similar circumstances and/or constituted medical malpractice/medical negligence because, among other things:

a. Failed to properly evaluate, diagnose, and/or treat Brodie prior to prescribing escitalopram oxalate, which is known to induce and/or exacerbate seizure activity and increase the risk for cardiac arrhythmias.

b. Failed to properly evaluate, diagnose, and/or treat Brodie despite the onset of new symptoms including daily headaches, chronic nosebleeds, suspected micturition syncope, as well as a newly prescribed prescription of escitalopram oxalate for neurological changes.

c. Failed to refer Brodie to a specialist for further evaluation and/or treatment despite the onset of new symptoms including daily headaches, chronic nosebleeds, suspected micturition syncope, and a newly prescribed prescription of escitalopram oxalate for neurological changes.

38. The medical care provided to Brodie by Patrick G. Swanson, M.D., whose acts and omissions are attributable to Defendant United States for purposes of the FTCA, John and Jane Does 1-10, fell below the generally accepted standards of medical care, skill, treatment, and

diligence for health providers under the same or similar circumstances and/or constituted medical malpractice/medical negligence.

39. Such actions and/or omissions were intentional, willful, reckless, and/or demonstrate actual malice including a conscious disregard for the rights and safety of Brodie that had a great probability of causing him substantial harm.

40. At all times relevant to the claims raised in this Complaint, Patrick G. Swanson, M.D., whose acts and omissions are attributable to Defendant United States for purposes of the FTCA, John and Jane Does 1-10 were employed by and/or acting within the course and scope of their employment/agency on behalf of their employer(s), Hopewell Health Centers, Inc., whose acts and omissions are attributable to Defendant United States for purposes of the FTCA, making these Defendants vicariously liable pursuant to *Respondeat Superior* and/or Agency by Estoppel.

41. As a direct and proximate result of the breach of the generally accepted standards of medical care, skill, treatment, and diligence for health care providers under the same or similar circumstances and/or medical malpractice/medical negligence by Patrick G. Swanson, M.D., whose acts and omissions are attributable to Defendant United States for purposes of the FTCA, John and Janes Does 1-10 were employed by and/or acting within the course and scope of their employment/agency on behalf of their employer(s), Defendants United States of America, Brodie DeLancy died February 19, 2024.

42. As a further direct and proximate result of the breach of the generally accepted standards of medical care, skill, treatment, and diligence for health care providers under the same or similar circumstances and/or medical malpractice/medical negligence by Patrick G. Swanson, M.D., whose acts and omissions are attributable to Defendant United States for purposes of the FTCA, John and Jane Does 1-10, Brodie's beneficiaries have suffered damages in excess of

$75,000 including the loss of society of the decedent including the loss of his companionship, consortium, care, assistance, attention, and protection.

43. As a further direct and proximate result of the breach of the generally accepted standards of medical care, skill, treatment, and diligence for health care providers under the same or similar circumstances and/or medical malpractice/medical negligence by Patrick G. Swanson, M.D., whose acts and omissions are attributable to Defendant United States for purposes of the FTCA, John and Jane Does 1-10, the beneficiaries of the decedent have suffered damages in excess of $75,000 including severe and permanent mental anguish, grief, and distress.

44. As a further direct and proximate result of the breach of the generally accepted standards of medical care, skill, treatment, and diligence for health care providers under the same or similar circumstances and/or medical malpractice/medical negligence by Patrick G. Swanson, M.D., whose acts and omissions are attributable to Defendant United States for purposes of the FTCA, John and Janes Does 1-10, the beneficiaries of decedent have suffered damages including funeral and burial expenses and other out-of-pocket expenses.

45. As a further direct and proximate result of the breach of the generally accepted standards of medical care, skill, treatment, and diligence for health care providers under the same or similar circumstances and/or medical malpractice/medical negligence by Patrick G. Swanson, M.D., whose acts and omissions are attributable to Defendant United States for purposes of the FTCA, John and Jane Does 1-10, the beneficiaries of the decedent have damages including a loss of future earning capacity of the decedent, in excess of $75,000.

**WHEREFORE**, Plaintiff Laura DeLancy, Administrator of the Estate of Brodie Malakai DeLancy, demands judgment against Defendants United States of America, John and Jane Does 1-10, jointly and severally, for compensatory damages in amount exceeding $75,000;

punitive damages, for prejudgment interest, costs and fees; and for all and any other relief, legal or equitable, which this Court deems just and appropriate.

Respectfully submitted,

*/s/ Damion M. Clifford*

Damion M. Clifford (0077777)
Jonathan P. Corwin (0075056)
**ARNOLD & CLIFFORD LLC**
115 W. Main St., 4th Floor
Columbus, Ohio 43215
Tele: (614) 460-1600
Fax: (614) 469-1093
Email: dclifford@arnlaw.com
jcorwin@arnlaw.com

*Counsel for Plaintiff*

**JURY DEMAND**

Plaintiff hereby demands a trial by jury as to all justiciable issues.

*/s/ Damion M. Clifford*
Damion M. Clifford